**ADVANCED TECHNOLOGY CORP., Plaintiff,**

v.

**ELISKIM, INC., Defendant.**

**No. 1:96CV755.**

United States District Court, N.D. Ohio, Eastern Division.

Feb. 28, 2000.

Carter E. Strang, Arter & Hadden, Cleveland, OH, C. Anthony Stavole, Stavole & Miller, Cleveland, OH, for plaintiff.

David G. Ries, Thorp, Reed & Armstrong, Pittsburgh, PA, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Advanced Technology Corporation ("ATC") brings this action seeking cost recovery and, in the alternative, contribution from defendant Eliskim, Inc. for response costs incurred by ATC under the Comprehensive Environmental Response Compensating and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.* ("CERCLA"). ATC also seeks declaratory relief that Eliskim is liable for future response costs. Both parties have filed motions for summary judgment. For the reasons that follow, ATC's motion for summary judgment (Doc. # 41) is granted in part and denied in part, and Eliskim's motion for summary judgment (Doc. # 37) is granted in part and denied in part.

ATC has three remaining claims against Eliskim: 1) Cost recovery under CERCLA § 107(a);[1] 2) contribution under § 113(f)(1); and 3) declaratory relief. Both parties ask for summary judgment on the first two claims, and Eliskim also asks for summary judgment on ATC's declaratory relief claim. For the reasons explained below, summary judgment is in-appropriate on ATC's § 107(a) claim because there are disputed issues of material fact. As to ATC's second claim, this Court finds that ATC is entitled to contribution from Eliskim under § 113(f)(1); however, there are disputed issues of material fact as to whether Eliskim's contribution should be complete, partial, or nothing. Finally, summary judgment is granted in favor of Eliskim on ATC's declaratory relief claim, and that claim is dismissed.

## I. Background

Eliskim, formerly known as True Temper Corporation,[2] owned a parcel of land referred to in this litigation as the "True Temper Site" from 1902 until 1980.[3] The True Temper Site is located in Ashtabula County, Geneva, Ohio and is approximately 49 acres in size. In 1980, Eliskim sold a portion of the True Temper Site to Northeast Realty & Investments, Inc. ("Northeast"). Northeast then sold 15.5 acres to ATC, which ATC still owns. Eliskim currently owns 19.44 acres of the True Temper Site.

At some point in time prior to 1980, Eliskim's manufacturing activities on the True Temper Site resulted in lead contamination of the soil. Some of this lead contamination occurred on the property currently owned by ATC, including an area of land surrounding a quonset hut. How much knowledge anyone, including ATC and Northeast, had of this contamination in 1980–81 is unclear. ATC had knowledge that some portions of the True Temper Site had environmental problems, because an 18.43 acre parcel that Northeast originally planned to purchase from Eliskim and then sell to ATC was "held back" because necessary approvals were not ac-

---

1. Throughout this memorandum and order, the Court references the CERCLA statutory sections by their CERCLA designation. For the sections referred to in this order, the last two numbers of the CERCLA section are identical to the last two numbers of the 42 U.S.C. section. Thus, §§ 101, 107(a), and 113(f)(1), correspond to 42 U.S.C. §§ 9601, 9607(a), and 9613(f), respectively.

2. Eliskim changed its name from "True Temper" to "Eliskim" in 1986. For purposes of continuity, Eliskim will be referred to as the defendant throughout this order.

3. From 1902–1949, American Fork & Hoe owned the land. There is no dispute that American Fork & Hoe is Eliskim's predecessor-in-interest. From 1949–1980 the land was owned by Eliskim (i.e., True Temper).

quired from the Environmental Protection Agency. However, the eventual sales contract between ATC and Northeast included provisions stating that Eliskim was responsible for all hazardous waste on the property ATC was purchasing and that Eliskim would remove any such waste by April 5, 1981. Further, ATC represents to this Court that they reasonably believed that the land that they purchased was not contaminated and that the contamination was limited to the 18.43 acres that were not purchased. The record available to the Court contains little additional evidence on these issues.

At some time in 1993, the Ohio Environmental Protection Agency ("OEPA"), with ATC's permission, collected soil samples in the vicinity of the quonset hut and found lead in the soil at levels up to 1,490 parts per million (ppm). In 1994, the OEPA conducted an expanded site investigation of the True Temper Site and collected additional soil samples from the area in and around the quonset hut; this sampling revealed lead contamination as high as 2,260 ppm. However, while the OEPA did its sampling on ATC's property with ATC's permission, there is no evidence in the record indicating to what extent, if any, the OEPA communicated its findings to ATC and, if so, what if any directions or advice the OEPA gave to ATC regarding the contamination and/or use of the property. Further, ATC has represented to this Court that it was not aware of any lead contamination until informed of that fact by the United States Environmental Protection Agency ("EPA") later that year, as described below.

On August 23, 1994, the EPA visited the True Temper site and discovered ATC in the process of demolishing the quonset hut. These actions exposed lead contaminated soils, and the EPA concluded that there was a risk of the lead contaminated soil becoming airborne, thereby threatening the safety of surrounding residents, employees of nearby businesses, and students at a neighboring elementary school. The EPA decided that immediate action was needed and entered into an Adminis-

trative Order of Consent with ATC ("ATCAOC") directing ATC to remove from the property hazardous soil that exceeded 300 ppm lead.

In the spring of 1995, ATC excavated an area of approximately 100 feet by 150 feet to an average depth of 1.5 to 2 feet. At this point ATC asked the EPA that they be allowed to stop work. In June of 1995, the EPA notified ATC that their removal action had abated the inhalation risk posed by the lead contaminated surface soils and approved ATC's close out plan, noting that the remaining contaminated soils would be addressed in a non-time critical removal action. There are disputed questions of fact as to the extent to which ATC complied with the original terms of the ATCAOC. There are also questions of fact regarding whether the original goal of the ATCAOC, to remove soil with contamination in excess of 300 ppm lead, was an unreasonably stringent clean-up level.

In 1997, Eliskim entered into an Administrative Order of Consent with the EPA ("ELIAOC") to remove hazardous contaminants, including lead, from the True Temper Site. The area of the clean-up included portions of land owned by ATC. In the ELIAOC, Eliskim was required to remove soil contaminated with lead in excess of 1,387 ppm.

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to demonstrate the existence

of a material dispute as provided in Rule 56(e):

.... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, this Court must view the evidence in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505.

## III. ATC's Innocent Landowner Claim

■ Congress passed CERCLA hoping to clean up land contaminated with hazardous substances and to make "responsible" parties pay for the clean-up. Liability under CERCLA is defined in CERCLA § 107, and § 107(a) identifies potentially responsible parties ("PRPs"). Both the current owner of a given site and the owner of the site at the time of disposal are considered PRPs, making both ATC and Eliskim PRPs. § 107(a)(1–2). Under CERCLA, liable parties are jointly and severally liable for removal costs incurred by the government, or by any other person consistent with the national contingency plan. § 107(a). However, one PRP may not seek cost recovery, under § 107(a) against another PRP; they are instead limited to contribution actions under § 113(f)(1) (liability under § 113(f)(1) is several only). *See Centerior Service Company v. Acme*, 153 F.3d 344, 345 (6th Cir.1998). Eliskim argues that ATC's claim for cost recovery under § 107(a) fails because ATC is a PRP.

However, ATC argues that it may still seek recovery under § 107(a) on the theory that ATC is an "innocent landowner." Persons who are otherwise liable under § 107(a), may escape liability if eligible for one of three affirmative defenses that are established in § 107(b). A number of courts have held or indicated that a PRP, who can establish a defense to liability under § 107(b), is exempt from the general rule that one PRP may not sue another PRP under § 107(a). *See M & M Realty Company v. Eberton Terminal Corp.* 977 F.Supp. 683, 686 (M.D.Pa.1997) (holding to this effect and discussing a variety of Circuit Courts that have indicated their approval). While the Sixth Circuit has not directly addressed this issue, such a ruling is consistent with its rationale in the *Centerior Service* decision, and this Court is unaware of any court which has held that an innocent landowner, as defined by § 107(b)(3), is precluded from suing for cost recovery under § 107(a). Therefore, this Court holds that if ATC can establish itself as an innocent landowner under § 107(b)(3), then ATC is entitled to complete cost recovery from Eliskim under § 107(a).

■ Under the facts of this case, in order to establish the innocent landowner defense and obtain recovery from Eliskim,

ATC must show, by a preponderance of the evidence, that:

1) A party other than ATC was the sole cause of the release of the hazardous substances;

2) Eliskim is a liable party under § 107(a);

3) ATC did not actually know about the presence of the hazardous substance at the time of acquisition;

4) ATC undertook appropriate inquiry when ATC acquired the property, in order to minimize its liability; and

5) ATC exercised due care once the hazardous substance was discovered. *See* CERCLA §§ 107(a–b), 101(35)(A); and *M & M Realty*, 977 F.Supp. at 687.

ATC has fulfilled the first three requirements. ATC has produced evidence demonstrating that Eliskim released the lead onto the property in question while Eliskim was the owner/operator of the property and that ATC did not actually know about the presence of lead contamination when it purchased the property, and Eliskim has not produced any evidence that is sufficient to raise a material question of fact on these points. However, disputed issues of fact remain regarding whether or not ATC undertook appropriate inquiry before purchasing the property and whether ATC exercised due care once the lead contamination was discovered.

What constitutes appropriate inquiry is a mixed question of law and fact and will depend on the totality of the circumstances. Eliskim asserts that ATC was on notice that there might be environmental hazards on their property because of the "hold back" of 18.43 acres from the 1981 sale. Eliskim further asserts that ATC did not conduct an environmental audit of the property, with the unstated implication that failing to do so does not constitute "appropriate inquiry." ATC counters that they received assurances that any environmental contamination was limited to the 18.43 acres that were held back, that no contamination was evident on the land that they purchased, and that therefore, they had no reason to believe that there was any contamination on that land.

The Court cannot definitively decide this issue on the basis of these facts and assertions. The Court does not doubt that the environmental problems on the unsold portion of land should have, at the least, raised ATC's suspicions. However, the assurances received by ATC, depending on the totality of circumstances surrounding those assurances, may have been adequate to reasonably alleviate ATC's suspicions. Further, what might be considered "due diligence" in checking for environmental contamination in 1981, when CERCLA was in its infancy, may be quite different from what would be required today, and, other than Eliskim's unstated implication, neither party has discussed what would have constituted "appropriate inquiry" by ATC.

Additionally, there are disputed issues of fact regarding whether ATC exercised due care once the lead contamination was discovered. Eliskim asserts that since ATC gave the OEPA permission to do sampling on its property, ATC was on notice of the lead contamination and thus did not exercise due care when ATC demolished the quonset hut and exposed the lead contaminated soil to the air. This, of course, is not a sufficient argument, because simply allowing the OEPA onto one's land to do testing, does not mean that one necessarily has knowledge of all the results. Seymour Stein, the President of ATC, asserts, rather vaguely, in his affidavit, that ATC was not *informed* of any lead contamination on its property until the EPA so informed ATC while ATC was in the process of demolishing the quonset hut. Of course, not being "informed" that lead is on one's property, is not the same as not knowing that lead is there, and this Court will not conclude, merely from Stein's statement, that ATC had no knowledge or suspicion of lead contamination on its property until they were in the middle of demolishing the quonset hut. Further, even if ATC does demonstrate that they did not know about

the lead until the quonset hut incident, ATC bears the burden of demonstrating that they exercised due care after discovering the lead, and no evidence has been presented on this issue. Finally, the Court reminds ATC that, contrary to assertions in their briefs, they bear the burden of proving the innocent landowner defense by a preponderance of the evidence, and therefore, cannot prevail on summary judgment (or at trial) by simply asserting that Eliskim has produced no evidence that disproves the innocent landowner defense. Even if Eliskim produces nothing, ATC must produce evidence sufficient to raise an inference in their favor on each element of the innocent landowner defense.

## IV. ATC's Contribution claim under § 113(f)(1)

Alternative to its claim for cost recovery under § 107(a), ATC has also asserted a claim against Eliskim for contribution under § 113(f)(1). In 1986, Congress added § 113(f)(1) to CERCLA, allowing PRPs to obtain contribution from other PRPs. There are often many PRPs in a CERCLA action, and, because of the joint and several liability provisions of § 107(a), one PRP may incur response costs that are disproportionate to that PRP's actual fault. Under § 113(f)(1), the scales must be balanced, as courts "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." CERCLA § 113(f)(1).

Eliskim does not dispute that ATC has a prima facie case for contribution; however, Eliskim argues that they have contribution protection under § 113(f)(2) and that this bars ATC's claim. In order to encourage PRPs to promptly and efficiently settle CERCLA claims with the government, Congress gave contribution protection to parties who settle with the government. For example, if PRPs X, Y, and Z are all liable for a $50 million CERCLA clean-up

of site A, and party X settles with the government for $5 million, parties Y and Z are prevented from seeking contribution from X, even if it can be demonstrated that X's fair share was actually $40 million.[4]

■ When Eliskim undertook clean-up actions on the True Temper Site in 1997, they settled with the government and received contribution protection. However, Eliskim's contribution protection does not protect it from ATC's claims, because contribution is forward looking only. Eliskim's contribution protection does not protect it from prior settlors, or parties who have already incurred response costs. *See United States v. Charter International Oil*, 83 F.3d 510, 522 (1st Cir.1996). Thus, in the example above, if Y, after X settled for $5 million, settled with the government for $15 million, Y would be protected from Z, but would not be protected from an action by X, asserting that $5 million exceeded X's fair share of the response costs. ATC's response costs (which were also part of a settlement with the government) occurred prior to Eliskim's settlement and there is nothing in Eliskim's settlement agreement indicating that the government meant to provide Eliskim with protection from prior settlors. Consequently, Eliskim's § 113(f)(2) settlement with the government is not a bar to ATC's claim for contribution.

■ This Court holds that ATC is entitled to contribution from Eliskim under § 113(f)(1) for Eliskim's fair share of the response costs. However, there are disputed issues of fact that make it impossible for this Court to determine, at this time, whether Eliskim's contribution should be complete, partial, or nothing. As discussed above, there are disputed issues of fact relating to ATC's actions in destroying the quonset hut. It was the destruction of the quonset hut that led to the EPA's decision that an immediate response was

---

4. Unless, of course, Y or Z is an innocent landowner and can pursue cost recovery un- der § 107(a).

necessary. If ATC did not know, and had no reason to know, about the lead contamination in the soil, and the destruction of the quonset hut was otherwise appropriate, then this Court is unlikely to impute any fault to ATC. However, if ATC did have knowledge, or suspicion, regarding possible lead contamination, then this Court will have to determine if, and to what degree, ATC's actions exacerbated the problem and led to more expensive response costs. Additionally, there are questions of fact relating to the level of the clean-up (why was ATC ordered to remove lead to 300 ppm, while Eliskim was only ordered to remove lead to 1,387 ppm), and whether ATC fully complied with the terms of the ATCAOC. Consequently, a ruling on Eliskim's share of the costs is premature.

## V. ATC's Compliance With the National Contingency Plan

 Eliskim also argues that ATC's clean-up actions were not consistent with the National Contingency Plan ("NCP"), because there were no public notice and comment sessions held, and that this bars both ATC's §§ 107(a) and 113(f)(1) claims. Eliskim is correct that consistency with the NCP is a prima facie requirement for recovery under either section; however, Eliskim's argument that public notice and comment is required for consistency with the NCP is misguided. While 40 C.F.R. § 300.700(c)(3)(i) provides, with reference to other sections, that public notice and comment is generally required for response actions to be "consistent with the NCP," § 300.700(c)(3)(ii) independently provides that "any response action carried out in compliance with the terms of an order issued by EPA ... will be considered 'consistent with the NCP.'" *See also Bancamerica Commercial Corporation v. Mosher Steel*, 100 F.3d 792, 796–97 (10th Cir.1996) (rejecting a similar argument and holding that public notice and comment is not required when there is compliance with an order issued by EPA). Therefore, public notice and comment is

not required when a party is acting at the direction of the EPA.

 Eliskim further argues, however, that ATC did not comply with the EPA's Administrative Order of Consent (the "ATCAOC"). This Court rejects that argument. Eliskim has produced some letters indicating that the EPA and ATC had some disagreements over the scope of the ATCAOC and argues that ATC did not fully comply with the terms of the ATCAOC. However, ATC has produced a letter from the EPA which states, *inter alia,* that: "This letter is to confirm that U.S. EPA was satisfied that ATC completed the emergency removal action on its property to address the inhalation risk set out in the AOC." The above referenced letter is more than enough to demonstrate that ATC complied with the EPA's order to the EPA's satisfaction, and this Court will not second guess the EPA's determination in this instance. Therefore, neither of ATC's claims are barred by inconsistency with the NCP.

## V. ATC's Declaratory Judgment Claim

 In addition to its claims for cost recovery/contribution, ATC seeks a declaratory judgment that Eliskim is liable to ATC "for all past and future response and removal costs, including attorneys' fees, incurred or to be incurred by ATC, pursuant to CERCLA." Eliskim moves for dismissal of this claim on the ground that this claim is moot as to lead and premature as to other substances. Without commenting on whether the action is moot in regard to lead contamination, this Court agrees that ATC's claim for declaratory relief is premature. This Court's eventual decision on the merits of ATC's claims for cost recovery and/or contribution will be dispositive on past response costs incurred by ATC. As for future costs, this Court will not declare Eliskim responsible for as yet unknown responses. Declaratory relief may be appropriate under CERCLA in a situation where response costs have been incurred, are ongoing, and the final amount

will not be determined until the completion of the clean-up. However, this is not such a situation, and this Court will not speculate as to whether additional response costs will be required in the future and, if required, whether Eliskim would be liable to ATC. *See VME Americas, Inc. v. Hein–Werner Corp.*, 946 F.Supp. 683, 694 (E.D.Wis.1996) (holding that declaratory relief under CERCLA is limited to situations where the plaintiff has incurred some level of expense associated with the alleged contamination).

## VI. Other Matters

The Court hereby sets this case for trial on Monday, May 15, 2000. The Court will hold a status conference on Friday, March 10, 2000, wherein an agenda will be set for trial and any other issues may be discussed.

## VII. Conclusion

For the foregoing reasons, both motions for summary judgment are granted in part and denied in part. Since there are genuine issues of material fact, a ruling on ATC's claim for relief under CERCLA § 107(a) is inappropriate at this time. Similarly, while this Court holds that ATC is entitled to contribution from Eliskim under § 113(f)(1), there are disputed issues of material fact as to what constitutes Eliskim's fair share. Finally, ATC's claim for declaratory relief against Eliskim is dismissed.

IT IS SO ORDERED.