[Cite as *Pearson v. Ewing*, 2014-Ohio-645.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

JAMES V. PEARSON, JR.,                  :

    Plaintiff-Appellee,                :           CASE NO.   CA2013-07-026

    - vs -                                      :           O P I N I O N
                                                2/24/2014
                                         :

ADAM EWING, et al.,                      :

    Defendants-Appellants.             :


CIVIL APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
Case No. 20110129


Robert D. Holmes, 7100 North High Street, Suite 201, Worthington, Ohio 43085, for plaintiff-appellee

Adam Ewing, 4759 US Highway 40, West Jefferson, Ohio 43162, defendant-appellant, pro se

Charles W. Ewing, 5375 Cosgray Road, Dublin, Ohio 43016, third-party defendant/appellant, pro se


**PIPER, J.**

{¶ 1}   Defendant-appellant, Adam Ewing, appeals a judgment entered against him in the Madison County Court of Common Pleas in favor of plaintiff-appellee, James Pearson.

{¶ 2}   Pearson operated a business on 39.4 acres of land that had been used as a salvage yard for approximately 50 years.  The property had once been owned by Pearson's father and uncle.  Pearson purchased his uncle's one-half interest in the property, and began

to independently operate the salvage yard business. When Pearson's father passed away, he left his interest to his wife, Pearson's mother. Upon the passing of Pearson's mother, Pearson and his sister, Carol, inherited the other 50 percent interest in the property. Carol then quitclaimed her interest in the property to Pearson, and he held full ownership of the land. Pearson ultimately contracted to sell the property to Ewing, who had performed various jobs for Pearson's salvage business.

{¶ 3} In March 2006, the parties entered into a contract, written by Ewing's father, Charles, whereby Pearson sold Ewing the real property and buildings for $250,000. That amount was due 180 days after the sale of the Amlin Farm, which was property owned by Ewing and his family, the proceeds of which were going to help pay for the salvage yard purchase.[1] The contract provided that regardless of the sale date of the farm, the purchase price for the salvage yard was due and owing no later than March 1, 2011. Pearson also sold Ewing an inventory of parts, equipment, and salvaged automobiles for $270,000, which was payable in monthly installments of $4,500 for 60 months.[2]

{¶ 4} In the contract, the parties also agreed that Ewing would pay taxes on the property, and that the parties would be jointly responsible for "any existing EPA problems and seller will execute necessary documents showing any known possible problems." Ewing also agreed to pay for liability insurance on the property.

{¶ 5} After Ewing took possession of the premises, Ewing told Pearson that he had discovered extensive hidden environmental issues on the property, which included an accumulation of tires, old rail road ties, buried car parts, and spilled gasoline. Despite the environmental issues not being resolved between the parties, Ewing paved the property with

---

1. The record suggests that the Amlin Farm property was never sold and remains in the ownership of the Ewing family.

2. The $270,000 purchase of inventory and related materials had been paid, and is not a part of the suit.

approximately 50,000 square feet of concrete, and also erected a building. However, Ewing refused to pay the $250,000 purchase price to Pearson by 2011.

{¶ 6} After Ewing failed to pay taxes, did not name Pearson as an insured party, and withheld payment of the contract purchase price, Pearson brought suit against Ewing, and later filed a request to amend his complaint to include Ewing's father, Charles. However, the trial court denied Pearson's motion, and Charles was never added as a party to the suit.

{¶ 7} After the discovery period passed, the matter was scheduled for a jury trial to commence on October 30, 2012. However, Pearson's counsel failed to appear for the trial, and the matter was bound over for rescheduling. The trial court issued an entry to address the rescheduling, and also addressed Ewing's pending motion that had asked the court to permit the Ohio EPA to decide significant issues in the case. However, the trial court denied Ewing's motion, and in the entry stated its intention to apply the doctrine of caveat emptor, rather than proceed with the theory that Ewing was excused from performance on the contract because Pearson failed to fulfill a condition precedent. The court also ordered discovery reopened on the issue of what potential EPA violations were actually present on the salvage yard property as of March 1, 2006, the contract's effective date.

{¶ 8} Ewing procured the services of an expert witness, and such disclosure was filed with the court on March 25, 2013. Thereafter, and once the reopened discovery time was closed again, Ewing's expert informed Ewing that he was no longer willing to appear as a witness on Ewing's behalf. Ewing claimed that his expert told him that he no longer wanted to participate in the trial after receiving a combative phone call from Pearson's attorney. Ewing then filed a motion with the trial court to request sanctions against Pearson's counsel and to set a status conference. The trial court denied Ewing's motion, and ordered discovery closed.

{¶ 9} The two-day jury trial commenced, and Ewing acted pro se. Ewing did not

present any expert testimony, and his only witness was his father, Charles. During deliberations, the jury asked the trial court if it was possible to force the parties to use any damage award to remediate any environmental issues on the property, and the trial court told the jury that it was not possible. The jury then rendered a verdict in favor of Pearson, and the trial court entered judgment ordering Ewing to pay $250,000 to Pearson for the unpaid purchase price of the land and building, as well as $25,696.26 for real estate taxes that Pearson was forced to pay in order to avoid foreclosure of the property. Ewing and his father, Charles, now appeal the trial court's judgment, raising the following assignments of error.[3]

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED WHEN IT DETERMINED WITHOUT A MOTION BY EITHER PARTY THAT CONDITION PRECEDENT [sic] TO THE PURCHASE OF THE PROPERTY WAS WAIVED BY APPELLANT.

{¶ 12} Ewing argues in his first assignment of error that the trial court erred by sua sponte ruling that no defense existed for failure to comply with a condition precedent within the contract and by ruling that the doctrine of caveat emptor applied.

{¶ 13} Despite Ewing's contention that the trial court sua sponte ordered that caveat emptor would apply and that the contract did not contain a condition precedent, the trial court's entry specifically noted that Ewing had filed a motion captioned "Motion to Allow the Issue of Environmental Compliance to be Determined by State Authorities." In his motion, Ewing moved the court to permit the parties to have the Ohio EPA determine whether there existed any environmental concerns regarding the property. More specifically, Ewing

---

3. Although the trial court denied Pearson's motion to join Charles Ewing as a party, see ¶ 6 above, this court permitted Charles to appeal the trial court's judgment so that Charles could argue he should have been permitted to file his own pleadings in the trial court. See Assignment of Error No. 2 below.

asserted, "the major issue in this case is the two fold question of whether plaintiff has disclosed all known environmental issues either in writing as the contract requires or otherwise. In addition, the question involves whether the property is in compliance with environmental requirements."

{¶ 14} The trial court specifically referenced the fact that the motion was pending and that the motion was "before it" for consideration. After recognizing that the motion was ripe for determination, the trial court began discussion of the contract term referenced above, which provided, "Seller & [sic] buyer to be jointly responsible for any existing EPA problems and seller will execute necessary documents showing any known possible problems. Buyers to be responsible for any EPA issues caused after the effective date of this agreement." The trial court then reviewed the possibility of applying either caveat emptor or condition precedent to the proceedings, and decided that there were no conditions in the contract based upon the plain language found therein.

{¶ 15} The trial court's discussion of the issues of caveat emptor and condition precedent was not raised in a sua sponte entry, but rather, was made in response to Ewing's motion to have the Ohio EPA determine liability in the case. The trial court was merely pointing out that the contract terms dictated the outcome of the suit, and that according to the unambiguous contract language, caveat emptor would apply rather than an argument that Pearson failed to perform a condition precedent.

{¶ 16} In support of his argument that the trial court erred by sua sponte raising the issue of caveat emptor, Ewing relies upon *HomEq Servicing Corp. v. Schwamberger*, 4th Dist. Scioto No. 07CA3146, 2008-Ohio-2478, for the proposition that a trial court errs by sua sponte granting judgment without a motion being filed. However, the *Schwamberger* case is easily distinguishable from the case sub judice.

{¶ 17} In *Schwamberger*, the Fourth District Court of Appeals reversed because the

trial court entered a judgment that had the same effect as either summary judgment or judgment on the pleadings without any pending motion to which the Schwambergers had the opportunity to respond. The *Schwamberger* court held that "by acting in the absence of a pending motion, the trial court denied the Schwambergers due process because they did not have notice and an opportunity to contest a sua sponte disposition." *Id.* at ¶ 13. The *Schwamberger* court further took issue with the fact that in the absence of any pending motion, the defendants "did not have an opportunity to marshal evidence to defeat summary judgment because they did not receive notice" of the trial court's intention to grant judgment without a trial or any further proceedings. *Id.*

{¶ 18} Here, however, the trial court's ruling did not have a dispositive effect on the proceedings, and instead, the matter proceeded to a jury trial where both parties were able to offer their full litany of evidence to the jury in support of their claims. The trial court made its entry, in part, to address Ewing's request to have the Ohio EPA intervene in the case and decide whether or not there existed environmental violations on the property. It did not, however, amount to summary judgment or judgment on the pleadings.

{¶ 19} The trial court's entry also served to place the parties on notice that the discovery period would be reopened in order to better establish what, if any, environmental concerns existed on the property as of the contract date. The reason the trial court reopened discovery for this limited purpose was its ruling that the doctrine of caveat emptor, rather than condition precedent, would apply at trial.

{¶ 20} The trial court analyzed the doctrine of caveat emptor, and correctly found it applicable to the case at bar. As this court has explained, "the principle of caveat emptor applies to sales of real estate relative to conditions open to observation." *Kearns v. Huckaby*, 12th Dist. Butler No. CA2005-12-507, 2006-Ohio-5196, ¶ 17.

{¶ 21} Where disputed conditions are discoverable and the purchaser has the

opportunity for investigation and determination without concealment or hindrance by the seller, the purchaser has no just cause for complaint. *Id.* This is true even if there are misstatements and misrepresentations by the seller, so long as such are not "so reprehensible in nature as to constitute fraud." *Id.*, citing *Traverse v. Long*, 165 Ohio St. 249, 252 (1956).

{¶ 22} The rationale underlying the doctrine is that "a party has no right to rely on certain representations regarding the property when the true facts are equally open to both parties." *Huckaby* at ¶ 18. The doctrine of caveat emptor will apply when (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the seller. *Sexton v. Wiley*, 12th Dist. Butler No. CA2004-05-115, 2005-Ohio-2269, citing *Layman v. Binns*, 35 Ohio St.3d 176 (1988).

{¶ 23} The trial court set forth the doctrine, and then ruled that discovery would be reopened so that the parties could determine "what known latent potential EPA problems existed on the property [sic] March 1, 2006."[4] The trial court's ruling regarding the application of caveat emptor and the reopening of discovery, therefore, did not have any dispositional impact on the case, as would be the case with summary judgment or judgment on the pleadings. The opposite is true in this case. The trial court specifically gave Ewing the opportunity to procure evidence to prove that the environmental concerns were not open to observation and were not discoverable upon investigation. Instead of disposing of Ewing's defense theory, the trial court's ruling gave Ewing the opportunity to discover evidence necessary to prove that caveat emptor did not bar judgment in his favor.

{¶ 24} The same is true for the trial court's conclusion that the contract did not contain

---

4. The trial court is making reference to the fact that sellers have a common law "duty to disclose material facts that are latent." *Binns*, 35 Ohio St.3d at 178.

a condition precedent. A condition precedent is an act or event that must occur before the agreement of the parties become operative. *Webb v. Pewano, Ltd.*, 12th Dist. Fayette Nos. CA2008-10-036, CA2008-12-042, 2009-Ohio-2629, ¶ 15. If a condition precedent is not fulfilled, the parties are excused from performing under the contract. *Id*. "Whether a contractual provision is a condition precedent or merely a promise to perform is a question of the parties' intent. A court ascertains that intent from the language of the particular provision, the language of the entire agreement, and the subject matter of the agreement." (Internal citations omitted.) *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 196 Ohio App.3d 784, 2011-Ohio-4979, ¶ 14 (10th Dist.).

**{¶ 25}** In regard to the environmental clause of the contract, Ewing argues that the trial court erroneously held that the contract clause did not constitute a condition precedent. However, we agree with the trial court's determination that the clause was not a condition precedent. Stated once more, and in full, the contract provision at issue provides, "seller & [sic] buyer to be jointly responsible for any existing EPA problems and seller will execute necessary documents showing any known possible problems. Buyers to be responsible for any EPA issues caused after the effective date of this agreement."

**{¶ 26}** The contract unambiguously obligated (1) Pearson and Ewing to be jointly responsible for any existing EPA problems as of the date of the contract, and (2) Pearson to execute necessary documents showing any known possible problems. However, nowhere did the contract language condition the sale of the salvage yard on either of these obligations. Instead, the contract language merely sets forth an unconditional promise by both parties to jointly remediate existing EPA violations and Pearson's promise to provide documents showing known possible problems. If Ewing intended to structure the transaction in such a way as to make his purchase contingent upon either the joint responsibility to remediate or upon Pearson's responsibility to provide documentation, he could have easily

included such language to that effect, especially as the party who drafted the contract. However, he did not.

{¶ 27} Moreover, and even if we were to find that the trial court should have waited for a more opportune time to rule that caveat emptor applied rather than condition precedent, such as at trial or after a hearing on the issue, we cannot say that the timing of the court's ruling was reversible error. According to Civ.R. 61,

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

{¶ 28} The record clearly demonstrates that the trial court's ruling did not affect Ewing's substantial rights, and that the ruling was not inconsistent with substantial justice. Instead, and as we have already established, the trial court correctly ruled that caveat emptor applied and that there was not a condition precedent within the contract, the non-performance of which, excused Ewing from performing.

{¶ 29} Additionally, a review of the transcript reveals that the trial court gave Ewing latitude in presenting his arguments to the jury. Instead of prohibiting Ewing from presenting any evidence that he did not perform on the contract because of Pearson's nonperformance, the trial court allowed Ewing to argue that his nonperformance was excused because the remediation never occurred and because Pearson never produced any documentation of possible EPA problems.

{¶ 30} During Ewing's opening, he told the jury, "I have not executed on that end of the contract, because [Pearson] has also not executed on portions of the contract which he needs to execute before we can go forward." Throughout the trial, Ewing presented

evidence to support his claims that Pearson had not performed on the contract as agreed, and the jury was offered the opportunity to determine if Ewing's breach of the contract was excused because of any breach perpetuated by Pearson. During closing, Ewing reviewed the evidence and suggested to the jury that Pearson should not be awarded judgment "because they have not performed their disclosure of environmental issues related to the property or participation in the cleanup of such items."

{¶ 31} While the jury was never instructed on condition precedent, the trial court did not deny Ewing the opportunity to offer evidence and present an argument emphasizing that he should not have to perform under the contract because of Pearson's own non-performance. Therefore, and even absent any jury instruction on the issue, the jury could have ruled in favor of Ewing by finding that Pearson failed to perform his obligations, which would have had essentially the same effect as finding that a condition precedent was not performed.

{¶ 32} By virtue of its verdict, however, the jury found that Ewing was not excused from performing his contractual duties. This verdict would not have changed even if the trial court had, for some reason, not issued its previous ruling that caveat emptor, rather than condition precedent, would apply.

{¶ 33} Therefore, the trial court did not err in issuing its entry, and any tangential error, if one had occurred, would be completely harmless. As such, Ewing's first assignment of error is overruled.

{¶ 34} Assignment of Error No. 2:

{¶ 35} THE TRIAL COURT ERRED WHEN IT REFUSED TO RECOGNIZE THE ANSWERS AND COUNTERCLAIMS FILED BY CHARLES EWING ON TWO SEPARATE OCCASIONS.

{¶ 36} Ewing and his father, Charles, argue in the second assignment of error that the

trial court erred by denying Charles the opportunity to file an answer and counterclaims.

{¶ 37} Charles asserts that he was entitled to file a counterclaim and has standing to participate in the suit because he is either a third-party beneficiary on the contract, or an assignee. In support of his contention, Charles argues that he is a third-party beneficiary because Pearson understood that part of the purchase price of the salvage yard was coming from the sale of the Amlin Farm, of which Charles had an ownership interest. However, and even if part of the purchase price was intended to come from the sale of the Amlin Farm, the record is clear that Pearson has never received the purchase price for the property, even if it *was* to come from the farm proceeds.

{¶ 38} Moreover, there is no indication in the record that Charles was meant to directly benefit from the contract between his son and Pearson. According to the Ohio Supreme Court, "only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161 (1991). In explaining who constitutes a third-party beneficiary, the court adopted the Restatement of Contracts, and noted that,

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Hill v. Sonitrol of Southwestwen Ohio, Inc.*, 36 Ohio St.3d 36, 40 (1988).

{¶ 39} The *Sonitrol* Court also noted that while "performance of a contract will often benefit a third person" no duty to that person is created unless the person is an intended

beneficiary to the contract. *Id.* The court then adopted a test, first set forth by the Sixth Circuit Court of Appeals in *Norfolk & Western Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir.1980). Therein, the Sixth Circuit utilized the "intent to benefit" test to determine whether a third party is an intended or incidental beneficiary.

> Under this analysis, if the promisee * * * intends that a third party should benefit from the contract, then that third party is an "intended beneficiary" who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an "incidental beneficiary," who has no enforceable rights under the contract. * * * [T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary.

{¶ 40} Here, there is no indication that Charles was a third-party beneficiary to the contract entered into by Ewing and Pearson. The language of the contract does not express any intent that Charles benefit from the contract. The only parties to the contract were Ewing and Pearson, and no mention was made of any promises that conferred a benefit upon Charles. While it is possible that the parties originally understood that part of the purchase price was coming from the sale of the property owned by Charles, there is no indication that Charles' offer to help Ewing pay for the property was anything more than an arrangement between a father and son to help Ewing start his business.

{¶ 41} The record does not indicate, and Charles has not pointed to evidence, that Ewing and Pearson anticipated that performance of the contract terms would satisfy a duty owed by either party to Charles. While it may be true that Charles currently helps Ewing run the salvage yard and may himself profit from the business, any such benefit derived by Charles is incidental because there is no indication that he had any right to performance of the contract terms. There is no evidence in the record that the performance of the promise would have satisfied an obligation of the parties to pay money to Charles and there are no

circumstances that indicate the parties intended to give Charles the benefit of the promised performance. Therefore, Charles is not a third-party beneficiary to the contract.

{¶ 42} Charles also asserts that he was an assignee on the contract, thus granting him standing to pursue his counterclaims against Pearson. However, Charles presented no evidence of the supposed assignment before the trial court made its decision regarding Charles' standing. Ewing's answer did not assert that Charles was an assignee, only that his father was a "third party beneficiary of the contract." Furthermore, Charles asserted in his answer and counterclaim that he was a "third party defendant," a "third party beneficiary," and made a "third party beneficiary's counter claim," but never asserted that he was an assignee on the contract.

{¶ 43} Instead, Charles filed a memorandum in opposition to Pearson's motion to strike his answer and counterclaim, and claimed therein that the contract anticipated the prospect of assignments and that he "could be" an assignee. While the subsection specific to the assignment issue within the memorandum is titled "Movant is an assignee," Charles never attached a copy of the assignment or any documentation to demonstrate that an assignment occurred. Although Charles argued in his filing that the contract anticipated the possibility of assignments and that he "could be" an assignee, there is no evidence to substantiate the claim that he actually *was* an assignee on the contract.[5] The trial court did not have any evidence before it that Charles was an actual assignee on the contract, and

---

5. The record contains two references by Ewing wherein he makes reference to his family's corporation, C&E Enterprises, having been assigned the rights to the personal property purchased from Pearson, while no claim of assignment of the property is ever made. According to Ewing's trial brief, "the purchase of the personal property was assigned to my family's corporation, C&E Enterprises, Inc. ('CE') who has paid all obligations for the purchase of the personal property and is not obligated to purchase the real estate." Additionally, Ewing filed a Memorandum Contra Certain Provisions of Plaintiff's Motion for a Judgment Debtor Exam in which he stated, "the contract in question allowed and contemplated the assignment of purchase rights by me. From the beginning, C&E assumed the rights and obligations to purchase the personal property and subsequently paid the Plaintiff the entire $270,000.00 for the purchase of the personal property." However, Ewing never asserts that he has assigned the contract in regard to the property to anyone, including Charles.

properly ruled that Charles could not bring a counterclaim.

{¶ 44} Having found that the trial court properly denied Charles standing to bring a counterclaim, Ewing and Charles' second assignment of error is overruled.

{¶ 45} Assignment of Error No. 3:

{¶ 46} THE TRIAL COURT ERRED WHEN IT DECLINED TO DEAL WITH WITNESS TAMPERING BY COUNSEL FOR PLAINTIFF/APPELLEE ULTIMATELY LEADING TO THE LOSS OF DEFENDANT/APPELLANT'S EXPERT WITNESS, FALSE AFFIDAVITS BY PLAINTIFF/APPELLEE, AND FALSE REPRESENTATIONS TO THE COURT.

{¶ 47} Ewing argues in his third assignment of error that the trial court erred by not finding that Pearson had tampered with Ewing's expert witness, and that Pearson's attorney had made false representations to the court.

{¶ 48} While Ewing does not cite or rely upon any particular rule of civil procedure in regard to what sanctions he was seeking, he does state in his brief that "rules of discovery have a purpose of insuring that a fair trial be held."  Therefore, we will construe Ewing's argument as claiming that the trial court abused its discretion by not ordering sanctions against Pearson and his attorney for alleged discovery violations.

{¶ 49} According to the Ohio Supreme Court, "the discovery rules give the trial court great latitude in crafting sanctions to fit discovery abuses.  A reviewing court's responsibility is merely to review these rulings for an abuse of discretion." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256 (1996).  An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 50} As previously discussed, Ewing procured the services of an expert to determine whether there existed environmental concerns on the property as of the date of the contract. Once Ewing hired his expert and reported such to the trial court, Pearson's attorney sent the

expert a copy of a letter he had written to Ewing. The letter essentially stated that any testing that was performed or set to be performed needed to be disclosed to Pearson and shared with Pearson's own expert. Pearson's attorney also asked their own expert to contact Ewing's expert to discuss any findings and to share testing results. At some point after the letter was sent and the experts spoke to one another, Ewing's expert informed Ewing that he would no longer be willing to participate in the trial process. Ewing moved the court for a status conference, and asked for sanctions against Pearson's attorney for tampering with his witness.

{¶ 51} Ewing also made other claims that Pearson's attorney had filed false affidavits and had made other misrepresentations to the court as additional reasons why sanctions should be granted. The trial court denied Ewing's motion for a status conference and sanctions, and closed discovery.

{¶ 52} Despite Ewing's contention that his witness was tampered with, the record does not indicate that Ewing's expert declined to appear at trial because of anything done or said by Pearson's attorney or expert witness. Instead, Ewing reported to the trial court that his expert terminated his participation in the matter because of "a personal family health crisis." While the record suggests that Ewing's expert had been contacted by both Pearson's attorney and expert, Ewing's expert did not assert that his unwillingness to proceed had anything to do with the communications, and there is no indication in the record that Ewing's expert declined to participate further for any reason other than his personal family health crisis.

{¶ 53} Regarding Ewing's argument that Pearson's attorney made misrepresentations to the court, the court declined to make such a finding. At some point before trial, Pearson's attorney submitted an invoice regarding the amount of work he had performed up to a certain point. On the invoice, Pearson's attorney noted approximately three hours of work reviewing

an ante-nuptial agreement entered into between Pearson's mother and her second husband.[6] However, Pearson then stated in an affidavit that no copy of the ante-nuptial agreement existed, and provided in an answer to one of Ewing's interrogatories that no copy of the agreement had been found.

{¶ 54} After reviewing the record, we find no abuse of discretion in the trial court's decision to overrule Ewing's request for sanctions. The record does not contain any indication that the invoice submitted by Pearson's attorney established that Pearson had access to the ante-nuptial agreement. The invoice "for professional services" merely stated that Pearson's attorney "read Defendant's Memorandum on claim of title, Summary Administration, waiver of spousal rights, Antenuptial [sic] agreement referred to in Will and Review of exceptions preserved in paragraph 4 of title Option of attorney Gary Londergan."[7] The reference to reviewing the agreement may have been in regard to several tasks associated with the agreement, such as searching for the agreement among the probate documents, reviewing law specific to ante-nuptial agreements, or simply reviewing all of the documents regarding the transfer of title from Pearson's father to his mother and the chain of title issues presented therein.[8]

{¶ 55} Regardless, we find no need to speculate as to why Pearson's attorney charged his client for the three hours of service, and that is a matter left to Pearson and his attorney. Instead, the trial court had before it multiple filings by Pearson regarding the title issue, and

---

6 As discussed within Ewing's fifth assignment of error, the ante-nuptial agreement pertains to the title dispute and Ewing's claim that Pearson's mother hid the salvage yard from her second husband so that she could not pass clean title.

7. Pearson's attorney forwarded a copy of an invoice wherein review of the ante-nuptial agreement was referenced again. In this invoice, the charges relate to, "Letter regarding fee. Review Antenuptial [sic] Agreement Referred to in Pearson's mother's Will." Our analysis applies equally and in the same manner to both invoices, or any mention made of Pearson's attorney reviewing the ante-nuptial agreement.

8. Pearson's mother made reference to the ante-nuptial agreement in her will.

hundreds of pages of documents specific to the probate and distribution of the estate of Pearson's mother. The trial court was not persuaded that either Pearson or his attorney violated any discovery rule regarding the ante-nuptial agreement, and we will not disturb that finding on appeal. As such, Ewing's third assignment of error is overruled.

{¶ 56} Assignment of Error No. 4:

{¶ 57} THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON THE DOCTRINE OF STRICT LIABILITY OF AN OWNER FOR ENVIRONMENTAL ISSUES AND THE DOCTRINE OF INNOCENT OCCUPIER.

{¶ 58} Ewing argues in his fourth assignment of error that the trial court erred by instructing the jury on the doctrine of caveat emptor, rather than the doctrines of strict liability and innocent landowner as those doctrines relate to the Comprehensive Environmental Response and Liability Act (CERCLA).

{¶ 59} "A trial court has the duty to instruct the jury as to the applicable law on all issues presented in the case that are supported by the evidence." *Silver v. Jewish Home of Cincinnati*, 190 Ohio App.3d 549, 2010-Ohio-5314, ¶ 80 (12th Dist.). Determining whether a jury instruction is relevant rests within the sound discretion of the trial court. *Id.* When considering the appropriateness of a jury instruction, or when a specific jury instruction is in dispute, a reviewing court must examine the instructions as a whole, and should not reverse unless the trial court abused its discretion by failing to give the requested instruction and the complaining party was prejudiced as a result. *Id.* at ¶ 90.

{¶ 60} Ewing asserts that the trial court erred in instructing the jury on the doctrine of caveat emptor because the trial court should have applied legal principles pertinent to CERCLA. CERCLA was promulgated by Congress in order to remediate "land contaminated with hazardous substances and to make 'responsible' parties pay for the clean-up." *Advanced Technology Corp. v. Eliskim, Inc.*, 87 F.Supp.2d 780, 784 (N.D.Ohio 2000).

- 17 -

According to CERCLA, both the current owner of a given site and the owner of the site at the time of contamination are considered potentially responsible parties to whom liability can attach. *Id.*

{¶ 61} "CERCLA encourages private individuals to clean up environmental hazards by permitting them to recover specified costs of cleanup from parties defined by CERCLA to be responsible for the hazards." *Norfolk Southern Ry. Co. v. Shulimson Bros. Co., Inc.*, 1 F.Supp.2d 553, 555-56 (W.D.N.C.1998). In order to recover the costs of cleanup pursuant to CERCLA, a plaintiff must show "(1) that the defendant 'owned or operated' a 'facility' from which there was a 'release' or 'threatened release' of a hazardous substance, (2) that the defendant is a 'potentially responsible person,' and (3) that the plaintiff incurred necessary cleanup costs 'consistent with the national contingency plan.'" *Id.*

{¶ 62} Ewing argues that if he is forced to purchase the property, he will be liable for all EPA violations because CERCLA imposes strict liability on property owners for any environmental remediation. Ewing asserts that the jury should have been made aware of that fact, and also given an instruction as to the doctrine of innocent occupier, which is an affirmative defense to CERCLA's strict liability. According to Ewing's argument, he is able to demonstrate that he is an innocent occupier because the environmental concerns were on the property before he took possession of it. Ewing's argument fails for multiple reasons.

{¶ 63} First, CERCLA does not apply to the case at bar because Ewing has not incurred liability for the clean-up of hazardous substances. The testimony at trial demonstrated that neither the federal nor Ohio EPA has ever cited Pearson or Ewing for any EPA violation. Instead, Pearson testified that an Ohio EPA representative came onto the property to investigate a possible water contamination issue on a near-by property, but found that Pearson had not done anything to cause the contamination. Pearson asked the EPA representative to determine if there were any EPA violations or concerns on his property, and

none were found.

{¶ 64} Additionally, Pearson's expert witness, who is a licensed professional engineer, testified that he had performed environmental regulation assessments for approximately 25 years, whereby he investigates whether a property contains potential EPA violations. The expert testified that he performed one such assessment of the salvage yard and that the "goal of [the] walkthrough assessment was to identify any environmental compliance issues associated with the operations of the salvage business." After performing his assessment, the expert noted that the only violations included the existence of large amounts of tires on the property and improper storm water drainage.[9]

{¶ 65} The expert further testified that the existence of buried car parts, rail road ties, batteries, drums, and etc. on the property did not equate to EPA violations, and instead, were actually "anticipated at a facility like this* * * ." After being cross-examined about there being no EPA violations, Ewing asked Pearson's expert whether dumping gasoline onto the ground would constitute an EPA violation. Pearson's expert then reiterated that he did not find any other EPA violations besides the tires and storm water drainage issue, and that in his opinion he did not believe that the poured gasoline would be a compliance issue. Moreover, the expert testified that the EPA does not regulate the soil within the salvage yard into which the gasoline would have allegedly absorbed because "it's not a leaking underground storage tank site."

{¶ 66} Ewing never once submitted any evidence that he had incurred liability for any ordered remediation, or that there were, in fact, any environmental concerns on the property besides the tires and storm water issues. Although Ewing vehemently asserts that the

---

9. According to the expert's written report, the drainage issues were specific to several small drainage ditches that could not be followed past the property boundary lines because of dense vegetation. The expert noted that "the discharge of storm water from the subject site will require authorization and compliance with the new Ohio EPA General NPDES Permit Number * * *," which became effective in January 2012.

gasoline and buried car parts constitute EPA violations, he did not submit any evidence to support that claim, and never claimed that he had incurred liability for any remediation required by the EPA.

{¶ 67} Nor did Ewing present evidence to demonstrate that he would be subject to liability based on CERCLA's requirement that he owned or operated a facility from which there was a release or threatened release of a hazardous substance, that he is a potentially responsible party, or that he incurred necessary cleanup costs consistent with the national contingency plan. Therefore, Ewing's reliance on CERCLA is misplaced, and the trial court did not abuse its discretion by declining to instruct the jury on a federal statute that did not apply.

{¶ 68} Even if we were to somehow find that CERCLA is pertinent, the record demonstrates that Ewing could not successfully defend any future and potential liability as an innocent occupier. In order to employ the affirmative defense of innocent occupier, Ewing would be required to prove by a preponderance of the evidence that,

> (1) a third party was the sole cause of the release of hazardous substances; (2) Plaintiff acquired the property after the hazardous substances were disposed of there; (3) *at the time Plaintiff bought the property, it did not know that any hazardous substance was deposited there*; (4) Plaintiff undertook appropriate inquiry prior to purchasing the property; and (5) once it became aware of the presence of hazardous substances at the site, it exercised due care under the circumstances.

(Emphasis added.) *Containerport Group, Inc. v. Am. Financial Group, Inc.*, 128 F.Supp.2d 470, 479, (S.D.Ohio 2001).

{¶ 69} The record clearly demonstrates that Ewing knew of the EPA concerns at the time he took possession of the property, and cannot claim that he was an innocent occupier. Testimony elicited at trial, by both parties, indicates that Ewing was familiar with the salvage yard before he contracted to purchase it. Ewing was an employee of Pearson and performed

various jobs over a two-year period for the salvage yard, which gave him access to the property. Both Pearson and Charles Ewing testified that Ewing had access to the salvage yard and was familiar with the state of the property before he contracted to purchase it.

**{¶ 70}** Furthermore, photographs offered as evidence at trial indicate the presence of large amounts of tires on the property. These tires, which constituted one of only two environmental concerns, had been on the property for many years, as indicated by the growth of trees, shrubbery, and other vegetation in and around the tire piles. The tires are not hidden from view, and were obvious to anyone who came upon the property. Even though some pockets of tires and other debris were later found once Ewing took possession and began to operate the salvage yard, the tires and other debris were prevalent enough in the open spaces that Ewing cannot say he was unaware of their existence.

**{¶ 71}** We would also note that Ewing was aware of the tires and other issues, as he and Pearson included a clause in the contract referencing the environmental concerns.[10] Even before he agreed to purchase the property, Pearson and Ewing had a conversation regarding the EPA issues, and according to Charles' testimony, the parties "talked about the EPA issues." Although Ewing claims that he did not know about the buried car parts and other materials found on the property, those issues did not constitute EPA violations, and Ewing has not incurred any remediation liability for the other materials he claims constitute EPA violations.

**{¶ 72}** After reviewing the record, as well as the jury instructions as a whole, the trial court did not abuse its discretion in denying Ewing's request to instruct the jury on the impact

10. According to Ewing's pretrial brief, Pearson indicated to him before the contract was signed that there were two EPA issues on the salvage yard property, "a massive amount of tires stored in semi-trailers and solid waste primarily in the form of hundreds of rotting railroad ties and some household garbage and trash." While pretrial briefs do not constitute evidence, Ewing, nonetheless, admitted that he knew about the tire situation before he agreed to purchase the land.

of strict liability or innocent occupier as those issues are contemplated within CERCLA. As such, Ewing's fourth assignment of error is overruled.

{¶ 73} Assignment of Error No. 5:

{¶ 74} THE COURT ERRED WHEN IT DETERMINED THAT TITLE TO THE REAL PROPERTY PASSED TO PLAINTIFF WITHOUT PROBATE OR DISCLOSURE IN SUMMARY ADMINISTRATION.

{¶ 75} Ewing argues in his final assignment of error that the trial court erred when it found that Pearson held proper title to the property in question.

{¶ 76} Ewing asserts that Pearson never held proper title to the property so that he is not obligated to purchase the salvage yard as he contracted to do. In July 2012, the issue of who held proper title was decided upon summary judgment by the trial court. Therein, the court determined that Pearson held proper title based upon probate documents and recorded deeds.[11] We find no error in the trial court's determination, and affirm the grant of summary judgment.

{¶ 77} This court's review of a trial court's ruling on a summary judgment motion is de novo. *Lindsay P. v. Towne Properties Asset Management Co., Ltd.*, 12th Dist. Butler No. CA2012-11-215, 2013-Ohio-4124. Civ.R.56 sets forth the summary judgment standard and requires that (1) there be no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion being adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. Fayette No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Harless v. Willis Day*

---

11. The trial court's entry did not contain language indicating that its decision was a final appealable order. Therefore, Ewing was not under an obligation to appeal that decision to this court, and has not waived that issue on appeal. Civ.R. 54(A).

*Warehousing Co.*, 54 Ohio St.2d 64 (1978).

**{¶ 78}** The nonmoving party "may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996). A dispute of fact can be considered "material" if it affects the outcome of the litigation. *Myers v. Jamar Enterprises*, 12th Dist. Clermont No. CA2001-06-056, 2001 WL 1567352,*2 (Dec. 10, 2001). A dispute of fact can be considered "genuine" if it is supported by substantial evidence that exceeds the allegations in the complaint. *Id.*

**{¶ 79}** The record indicates, and proper evidence was presented to establish that, the salvage yard property was owned first by Pearson's father and uncle. In 1982, Pearson purchased his uncle's one-half interest in the property and operated the auto body salvage yard on his own. In 1987, Pearson's father died and his one-half interest in the property passed to Pearson's mother. Pearson's mother, who lived in Florida at the time, later remarried and executed an ante-nuptial agreement with her new husband in which the two released any claim against the assets in each other's estate, other than a life estate in the marital home. Pearson's mother died in 1993, and her husband made no claim to any of her assets, and even signed a petition for summary administration, which provided no distribution of assets to himself as the surviving spouse.

**{¶ 80}** Once Pearson's mother passed, her estate was divided among Pearson and his sister, Carol. The salvage yard passed to Pearson and Carol through a trust that Pearson's mother established, of which Pearson was trustee and held the right of distribution. Pearson quitclaimed the salvage yard property held in trust to himself and Carol, and then Carol quitclaimed her interest in the salvage yard to Pearson. Pearson recorded both the deed that quitclaimed the property from the trust to himself, as well as the quitclaim deed from his sister

wherein she conveyed her interest to Pearson.[12]  This chain of title demonstrates that Pearson owned 100 percent of the salvage yard.

{¶ 81} Additionally, in 2010, and after Ewing had occupied the property for four years without paying the property taxes, the property was foreclosed upon for failure to pay taxes. Although Pearson eventually paid all of the taxes himself to avoid losing the property, the foreclosure process included a judicial determination that Pearson owned the property in full and that he held valid title.

{¶ 82} Although Ewing asserts that Pearson should reopen his mother's probate in Ohio in order to obtain "a certificate of transfer or an order dealing with the property," the record indicates that the estate of Pearson's mother was properly disposed of through the Florida courts.  Moreover, Pearson was deemed by the Madison County, Ohio, court to be owner of the property, and was held solely responsible for the taxes accrued and owed upon the salvage yard.

{¶ 83} Ewing has not pointed to any evidence to demonstrate that Pearson does not hold proper title to the salvage yard.  Although Ewing alleges that Pearson somehow concealed the salvage yard from his stepfather during the probate of Pearson's mother's estate, there is no evidence that the stepfather or his heirs ever made any claim against any asset within the estate of Pearson's mother or that he was not aware of the land his wife held in Ohio.

{¶ 84} Ewing may not rest on the mere allegations that Pearson did not hold proper title, and his response to Pearson's motion for summary judgment failed to set forth specific facts showing the existence of a genuine triable issue.  As such, the trial court properly

---

12. The record indicates that Carol purchased a home in Ohio from her mother, and that Pearson's mother held a $75,000 mortgage on that property as a result.  However, this debt was forgiven in the will of Pearson's mother. Carol quitclaimed her share of the salvage yard to Pearson in order to offset the effect of her mother forgiving the debt as an inheritance.

granted summary judgment, and Ewing's final assignment of error is overruled.

**{¶ 85}** Judgment affirmed.

RINGLAND, P.J., and HENDRICKSON, J., concur.